## REX-HANOVER MILLS CO. v. UNITED STATES.

No. 45566.

Court of Claims.

Jan. 6, 1944.

As Amended on Denial of Motion for New Trial May 1, 1944.

A. E. James, of Washington, D.C., for plaintiff.

D. F. Hickey, of Washington, D.C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D.C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff sues to recover corporation income taxes in the amount of $6,180.59 assessed against the income of its predecessor in title, Rex Spinning Company, as a surtax on that company's undistributed net income for the year 1936, and paid, with interest, by the plaintiff. The word "plaintiff", in this opinion, is used to designate either the plaintiff or its predecessor. The plaintiff claims that if it had been given the credit authorized by Section 26(c) (1) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836, it would have had no taxable undistributed net income. The tax was assessed under Section 14 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 823, the parts of which, here pertinent, are printed in the footnote.[1]

Section 26(c) (1), under which the plaintiff claims that it should have received the credit which would have relieved it of the tax here in question, is as follows:

"§ 26. Credit of Corporations

"In the case of a corporation the following credits shall be allowed to the extent

---

[1] "§ 14. Surtax on Undistributed Profits.

"(a) Definitions. As used in this title—

"(1) The term 'adjusted net income' means the net income minus the sum of—

"(A) The normal tax imposed by section 13.

\* \* \* \*

"(2) The term 'undistributed net income' means the adjusted net income minus the sum of the dividends paid credit provided in section 27 and the credit provided in section 26(c), relating to contracts restricting dividends.

"(b) Imposition of Tax. There shall be levied, collected, and paid for each taxable year upon the net income of every corporation a surtax equal to the sum of the following, \* \* \*

"7 per centum of the portion of the undistributed net income which is not in excess of 10 per centum of the adjusted net income.

"12 per centum of the portion of the undistributed net income which is in excess of 10 per centum and not in excess of 20 per centum of the adjusted net income.

"17 per centum of the portion of the undistributed net income which is in excess of 20 per centum and not in excess of 40 per centum of the adjusted net income.

"22 per centum of the portion of the undistributed net income which is in excess of 40 per centum and not in excess of 60 per centum of the adjusted net income.

"27 per centum of the portion of the undistributed net income which is in excess of 60 per centum of the adjusted net income."

provided in the various sections imposing tax—

*   *   *   *   '   *

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account."

No regulation of the Department is of assistance in the solution of our problem.

The plaintiff claims that it had made such a written contract as is contemplated by Section 26(c) (1). In 1933, upon the retiring of its old preferred stock and the issuance of new preferred stock, the plaintiff's stockholders properly authorized the plaintiff to enter into an agreement with its stockholders, and to print on the stock certificates the following language embodying the agreement:

"The company shall, on December 1, 1934, and on the first day of December on each year thereafter, provide for a sinking fund by setting aside out of the assets, represented by its earnings or surplus, and before the payment of any dividend on any class of stock other than Preferred Stock, the sum of Thirty Thousand ($30,000.00) Dollars. And if there should be a failure in any year to set aside said fund it must be provided for in the next succeeding years, before the payment of any dividend on any common stock. This fund shall be kept separate and apart from all other assets of the company, and shall be used by the Board of Directors during the calendar year in which such sum is set aside in purchasing the Preferred Stock at the best price obtainable, but not exceeding one hundred and five ($105.00) dollars per share and accrued dividends. If sufficient Preferred Stock cannot be purchased at or below the price aforesaid to exhaust the sums in the sinking fund available therefor, the balance in the sinking fund shall be kept separate from the other assets of the com-

pany until such time as it may prove possible to purchase Preferred Stock at or below the price aforesaid."

The plaintiff did not, in 1934 or 1935, put money in the sinking fund for the retirement of its preferred stock in accordance with the agreement. On January 28, 1936, the plaintiff authorized the setting aside out of its 1936 earnings, $30,000, and on November 7, 1936, $60,000, to fulfill the sinking fund requirements for 1934, 1935, and 1936. The fund was used, in 1936, to retire preferred stock of a par value of $90,000. In its income tax return for 1936 the plaintiff only claimed a credit of $30,-000 under Section 26(c) (1). The Commissioner disallowed the credit. In its claim for refund made after the payment of the assessed deficiency, the plaintiff claimed a credit of $90,000. It now urges that a credit of $30,000 would be sufficient to reduce the tax on its undistributed income sufficiently so that it would be entitled to recover all that it sues for, and that it could in no event recover more, because of the statute of limitations. This is apparently correct, but since the Government makes no contention for a distinction between the plaintiff's right to a credit of $30,000 or a credit of $90,000, and no such distinction occurs to us, we shall not examine the point further.

The Government contends (1) that the agreement recited above was not the kind of agreement contemplated by Section 26(c) (1); and (2) that, in the financial circumstances in which the plaintiff was in 1936, it had other undistributed earnings and profits which it could have distributed even if the Section 26(c) (1) had been applicable to the $90,000, which other undistributed earnings and profits would have justified the tax collected and here sued for.

In disposing of the Government's first contention, we assume a negative answer to the second, i.e., we assume that the tax was not properly due if Section 26(c) (1) was applicable to the agreement recited above.

The text of the statute seems to apply quite exactly to the agreement as made. The statute allows a credit against the "adjusted net income" in the case, inter alia of (c) "Contracts restricting payment of dividends." To (c) (1) we find the heading "prohibition of payment of dividends." The text of (c) (1) speaks of the noncredit amount as the amount which can be distributed as dividends "without violating a provision of a written contract executed by the corporation prior to May 1, 1936,

which provision expressly deals with the payment of dividends."

The Government points us to certain decisions of the Supreme Court of the United States and other courts, which, it contends, support its argument. We turn to those decisions. In Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 111, 85 L.Ed. 29, the corporation, because of a previously existing deficit, was prohibited by state law from distributing as dividends its profits earned in 1936. The Supreme Court said: "The only 'written contract executed by the corporation' upon which respondent relies for its claimed exemption is its corporate charter, granted by the state of Washington. Upon the premises that respondent's Washington charter was a written contract, and that the Washington laws prohibiting dividend payments were by operation of law a part of that contract, the court below concluded that the taxpayer had satisfied the requirements of section 26 (c) (1)."

The Court concluded that the kind of contract contemplated by Section 26 (c) (1) was not present, and that the corporation was not entitled to the credit. The Court also said in its opinion: "That the language used in section 26(c) (1) does not authorize a credit for statutorily prohibited dividends is further supported by a consideration of section 26(c) (2). By this section, a credit is allowed to corporations contractually obligated to set earnings aside for the payment of debts.[2] That this section referred to routine contracts dealing with ordinary debts and not to statutory obligations is obvious—yet the words used to indicate that the section had reference only to a 'written contract executed by the corporation' are identical with those used in section 26(c) (1). There is no reason to believe that Congress intended that a broader meaning be attached to these words as used in section 26(c) (1) than attached to them under the necessary limitations of 26(c) (2)."

The phrase "routine contracts dealing with ordinary debts," has given rise to much discussion in later cases. The Government strongly urges its significance in our consideration of the instant case.

In the case of Metal Specialty Co. v. Commissioner, 43 B.T.A. 891, the Board of Tax Appeals held that a resolution of the corporation's board of directors, approved by a resolution signed by all stockholders, providing for the amendment of the corporation's charter to restrict the payment of dividends until after the accumulation of a sinking fund to retire preferred stock, was not the kind of agreement contemplated by Section 26(c) (1). The Board relied strongly on the Supreme Court's phrase "routine contracts dealing with ordinary debts," and concluded that a contract evidenced only by the corporate minutes, and made effective only by "delivery of the certificate of amendment and charter to the secretary of state" was not such a "routine contract" as was described in the Supreme Court's phrase. The Circuit Court of Appeals for the Sixth Circuit agreed with the Board. 128 F.2d 259.

In Warren Telephone Company v. Commissioner, 6 Cir., 128 F.2d 503, 506, the same court reached the same conclusion, though there, as in the case before us, the preferred stock certificate had printed on it the provisions restricting the payment of dividends. The court said: "The commitments contained in the stock certificates are but references to and repetitions of the charter provisions, and stand on no higher ground. Moreover, they are not contracts entered into by the corporation with creditors and are but internal agreements within the framework of corporate organization, and impose no external prohibition upon the corporation in respect to dividends."

Other language in the court's opinion shows that the Supreme Court's phrase about "routine contracts dealing with ordinary debts" was the real basis of the decision.

In Lehigh Structural Steel Co. v. Commissioner, 44 B.T.A. 422, upon facts closely analogous to those now before us, the Board of Tax Appeals denied the credit, and said: "The legislative intent was primarily to tax corporate earnings to the shareholders; and any attempt to frustrate the tax through the nondistribution of earnings was to be futile. The method adopted was the levy of a surtax upon earnings, with

---

[2] 49 Stat. 1664, 26 U.S.C.A. Int.Rev. Acts, page 836. The credit allowed is "An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside."

credits for dividends paid and for earnings which the corporation was contractually prevented from distributing. Obviously, to recognize a voluntary restriction not imposed from outside would defeat the purpose."

We think the Board, in its effort to protect the purpose of the act, did not give sufficient weight to the fact that the agreements contemplated by Section 26(c) (1) were agreements made prior to May 1, 1936, which was before the act which imposed the tax became effective. The statute therefore does not need to be given a construction shaped for the purpose of preventing parties, by agreement made with the objective of evading the tax, from succeeding in doing so. It would seem that the principal purpose of Congress in providing the credit, was to avoid penalizing a corporation for failure to distribute its earnings when it could not distribute them without violating its previously made agreement. This general purpose might have caused Congress to extend the credit to the corporation forbidden by law, as well as the one forbidden by agreement, from declaring dividends.[3] But the fact that the section did not go so far would not seem to be a reason for construing it more narrowly than its words seem to justify.

The Circuit Court of Appeals for the Third Circuit reversed the decision of the Board of Tax Appeals in the Lehigh Structural Steel case, 127 F.2d 67. It concluded that an agreement made by a corporation with the purchasers of its stock, expressly dealing with and restricting the payment of dividends, is no less within the contemplation of Section 26(c) (1) because the agreement is printed on the stock certificates and is, by amendment, inserted in the corporate charter. In the Warren Telephone Company case, supra, the court referred to and disagreed with the reasoning of the court in the Lehigh Structural Steel case.

We think that Section 26(c) (1) is applicable to the agreement which the plaintiff corporation made with its stockholders. The language of the section seems to be completely satisfied. The agreement was a real agreement, a natural one for the corporation to make in the circumstances, and not intended as a means of evading taxes. When persons purchased preferred stock containing this agreement, they were entitled to its benefits, not because it was imposed upon them by law, but because the plaintiff was willing to make it, and the purchaser was willing to buy the stock if it included it. We think the Supreme Court could hardly have intended to read into 26 (c) (1) a limitation of the written agreements there mentioned to agreements with creditors, when the Court's language was directed to Section 26(c) (2) which expressly deals only with written agreements requiring that earnings be set aside for the "discharge of a debt."

We now consider the Government's second contention. It is that the plaintiff had, in 1936, a surplus from which it could have paid dividends after setting aside the $90,000 as required by its contract, and that therefore the plaintiff paid no greater undistributed profits tax than it properly owed.

The difference between the parties as to whether the plaintiff had an accumulated surplus of earnings arises out of the following facts. The plaintiff was incorporated in 1915, under the laws of the State of North Carolina, with an authorized capital of $500,000, divided into 2,500 shares of common and 2,500 shares of preferred stock, both of a par value of $100 per share. It issued only 2,008 of the common shares. In 1920, by amendment to its charter, its authorized capital was increased to $1,000,000. It increased its issued shares of common stock of $100 par value, from 2,000 shares, the number then outstanding, to 6,000 shares, by the declaration of a stock dividend. The par value of its outstanding common stock was then $600,000. Between then and 1933 some of this stock was retired. In 1928 another and smaller stock dividend was declared. On January 1, 1933, there were outstanding 5,500 such shares of a par value of $550,000.

On October 17, 1933, the plaintiff's charter was again amended, and the authorized share structure was so changed as to provide for 6,000 shares of common stock without par value, instead of 6,000 shares of $100 par value. The number and par value of preferred shares were set at 4,000 and $100 respectively, as before. The agreement of the stockholders and of the corporation, printed on the new certificates of preferred stock, concerning the setting aside of a fund for the retirement of the preferred stock, has already been described.

---

[3] This seems to have been done, retroactively, by Section 501 (a) (2), (b), and (c) of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Acts.

Before the 1933 reorganization the plaintiff's books showed a deficit in the surplus account of $166,285.34. After the reorganization, the company's accountant charged the common capital stock account with $550,000, the entire par value of the common stock outstanding before the reorganization, and credited the surplus account with the same amount. This changed the surplus account from the deficit of $166,285.34 to a surplus of $383,714.-66. The effect of the change was to eliminate from the books any common capital stock account. The accountant made this change without any direction from the board of directors or of the stockholders. The corporation's books during the years 1934, 1935, and 1936 followed the same practice and thus showed a large surplus for each of those years. When the question of the taxation of the company's undistributed earnings under the 1936 act arose, the Commissioner of Internal Revenue went over the corporation's accounts for all the years following its organization in 1915, making "readjustments" for the reasons given in finding 8. The greatest changes made by the Commissioner in his adjustments consisted in the elimination of any effect upon the corporation's surplus accounts of the stock dividends which had been issued in 1920 and 1928, and which had been deducted from surplus on the company's books, and other changes resulting from those. The net result of his adjustments was to show a surplus of $286,421.-56, at the end of 1936, instead of the surplus of $546,034.26, shown, erroneously as the plaintiff says, by the corporation's books, because of the accountant's having credited the $550,000 to surplus in 1933 when the common stock was changed to no par value.

The Government urges that the surplus shown by the Commissioner was available to satisfy the preferred stock redemption commitment made by the plaintiff in 1933, and that therefore the plaintiff's 1936 earnings could have been distributed. Since they were not, the Government says they were properly taxed as undistributed earnings.

The plaintiff, on the other hand, claims that the deficit of $166,285.34 which its books showed as of the end of 1932, persisted through the succeeding years, except as reduced by $64,927.29 during the years 1933, 1934, and 1935, and should have shown as a deficit of $101,358.05 at the end of 1935; that credits to surplus in 1936 of

$113,892.31 finally wiped out the deficit, but only by $12,534.26 by the end of 1936; that that amount of surplus available for the redemption of the preferred stock would not have relieved enough of the plaintiff's earnings for 1936 of their commitment to the preferred stock redemption fund to make the plaintiff liable for the tax here sued for. The plaintiff subtracts $550,000 from each of the annual surpluses shown on its books, saying that the accountant's addition of that amount to surplus after the 1933 reorganization, and annually thereafter, should be disregarded.

The Commissioner of Internal Revenue's theory of determining surpluses is based upon the language of Section 115(h) (2) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 870, which is as follows:

"§ 115. Distributions by Corporations

\*     \*     \*     \*     \*

"(h) Effect on earnings and profits of distributions of stock. The distribution (whether before January 1, 1936, or on or after such date) to a distributee by or on behalf of a corporation of its stock or securities or stock or securities in another corporation shall not be considered a distribution of earnings or profits of any corporation—

\*     \*     \*     \*     \*

"(2) if the distribution was not subject to tax in the hands of such distributee because it did not constitute income to him within the meaning of the Sixteenth Amendment to the Constitution or because exempt to him under section 115(f) of the Revenue Act of 1934 or a corresponding provision of a prior Revenue Act."

Since, the Government says, the stock dividends declared by the plaintiff in 1920 and 1928 were not, under the doctrine of Eisner v. Macomber, 252 U.S. 189, 40 S. Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, taxable to the recipients, they should "not be considered a distribution of earnings or profits," and should not have been followed by any deduction from the corporation's surplus account. Ergo the plaintiff had a surplus, could have used it to satisfy the preferred stock retirement commitment, and had earnings which were distributable without violating the 1933 agreement but were undistributed and taxable.

The plaintiff says that Section 115(h) has nothing to do with the case; that Section 26(c) (1) permits the deduction of earnings which are foreclosed from distribution by an agreement; that while the

plaintiff's agreement did permit provision to be made for the preferred stock sinking fund out of "earnings or surplus," the meaning of the word "surplus" as used in that agreement was the meaning which was in the minds of the parties to the agreement, and not some other meaning which might be found in a federal statute or elsewhere.

■ We agree with the plaintiff on this point. The intent of Section 26(c)(1) is that if the corporation has made a binding agreement not to declare dividends out of certain accumulated earnings, it shall not be taxed for not declaring such dividends. Our only question is whether the plaintiff did in fact agree that it would not declare dividends until it had made provision for the preferred stock retirement fund out of earnings or surplus, not including in the word surplus as there written the values which it had previously earned but had capitalized by declaring stock dividends in 1920 and 1928, even though it had in 1933, as a part of the same transaction with the making of the agreement, changed its common stock from par value to no par value. What the accountant or even the directors did in the way of keeping books after the agreement was made would seem to have little bearing on what the parties meant by the agreement, except as evidence of what may have been in the minds of the parties, at the earlier, and decisive, time.

We think the meaning which the plaintiff attributes to the agreement was the real meaning of the parties to it. If the parties had intended that the reorganization would make existing assets available for the preferred stock retirement fund, and then for the payment of dividends on the common stock some evidence of that intent would have arisen during 1934, 1935, or 1936. There would, we suppose, have been demands by stockholders that the fund be set up, and the way thus cleared for the payment of dividends on the common stock. The language of the agreement is mandatory. It says "The company shall, on December 1, 1934, and on the first day of December on each year thereafter, provide for a sinking fund by setting aside out of the assets, represented by its earnings or surplus * * *." No money was set aside for the fund until new earnings of sufficient amount were available.

This conduct of the managers of the company in not setting aside funds for the retirement of preferred stock was also in accord with their duties under the laws of North Carolina, where the corporation was chartered. Sections 1161 and 1179 of Michie's North Carolina Code, as amended, provide:

"§ 1161. Decrease of capital stock.—

"The decrease of capital stock may be effected by—

* * * * *

"6. Reducing the par value of shares.

"When a corporation decreases the amount of its capital stock as above provided, the certificate decreasing the same shall be published at least once a week for three successive weeks * * *. In default of such publication the directors of the corporation are jointly and severally liable for all debts of the corporation contracted before the filing of the certificate, and the stockholders are also liable for such sums as they respectively receive of the amount so reduced. * * *"

"§ 1179. Dividends.

"Dividends from profits only; directors' liability for impairing capital.—

"No corporation may declare and pay dividends, except from the surplus or net profits arising from its business, * * * nor may it reduce, divide, withdraw, or in any way pay to any stockholder any part of its capital stock except according to this chapter: * * * In case of a violation of any provision of this section, the directors under whose administration the same occurs are jointly and severally liable, at any time within six years after paying such dividend, to the corporation and its creditors, in the event of its dissolution or insolvency, to the full amount of the dividend paid, or capital stock reduced, divided, withdrawn, or paid out, * * *."

The fact that no steps were taken by the managers of the corporation to comply with these affirmative provisions of the law is a further strong indication that they had no intention when they made the 1933 agreement, to treat any of their existing assets as surplus, available for the preferred stock retirement fund or for dividends.

We conclude, therefore, that the plaintiff is entitled to recover $6,180.59 with interest as provided by law.

It is so ordered.

JONES, Judge, took no part in the decision of this case.